IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHELSEA MANNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-CV-01654-APM |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), in Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 233 employees who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and

information pursuant to the FOIA as amended by the OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13,526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.  My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13,526,[1] and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA.  I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13,526 §§ 1.3 and 3.1.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act ("PA") of 1974, 5 U.S.C. § 552a.  Specifically, I am aware of the FBI's response to the FOIPA request of plaintiff, Chelsea E. Manning, seeking access to certain FBI records relating to the "investigation conducted by the Washington Field Office of the Federal Bureau of Investigation and U.S. Attorney's Office of the Eastern District of Virginia into the alleged disclosures of classified and sensitive but unclassified information by Private First Class (PFC) Bradley E. Manning" and relating to the investigation "into alleged civilian co-conspirators of the disclosures of information by Manning."[2]

(4)     The FBI submits this declaration in support of its motion for summary judgment. The Court granted the parties' proposal to bifurcated summary judgment proceedings, allowing

---

[1]   75 Fed. Reg. 707 (2010).

[2]   Plaintiff has legally changed her name from Bradley Edward Manning to Chelsea Elizabeth Manning.

2

the FBI to litigate first the applicability of Exemption 7(A) only, while preserving any additional underlying exemptions that may apply. *See* Minute Order (Dec. 15, 2015); *see also* ECF No. 11, Joint Status Report and Proposed Schedule. In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration provides the Court and plaintiff with an explanation of the FBI's recordkeeping system, the procedures used to search for records responsive to plaintiff's request, and provides justification for the FBI's withholding of information pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552a(j)(2) and FOIA Exemption 7(A). 5 U.S.C. § 552(b)(7)(A). In the event Exemption 7(A) expires during the pendency of this FOIA litigation, or if the Court denies the FBI's motion for summary judgment based on Exemption 7(A), the FBI preserves the right to, and will, assert additional underlying FOIA exemptions that may apply.

## PROCEDURAL HISTORY OF PLAINTIFF'S FOIPA REQUEST

(5)    A chronology and description of pertinent correspondence concerning plaintiff's FOIA request is set forth below. Copies of the relevant correspondence are attached hereto as **Exhibits A-N.**

(6)    By letter dated February 20, 2014, plaintiff submitted a FOIPA request seeking access to "documents, papers, working papers, reports, letters, and memoranda from the Federal Bureau of Investigation and the Department of Justice," and specifically:

- A. "Documents, papers, reports, letters, memoranda, films, electronic data, photographs, audio and video recordings of or relating to investigation conducted by the Washington Field Office of the Federal Bureau of Investigation and the U.S. Attorney's Office of the Eastern District of Virginia into the alleged disclosures of classified and sensitive but unclassified information by Private First Class (PFC) Bradley E. Manning beginning in late 2010 and continuing until an unknown date, but as late as mid-2012."

- B. "Any other documents, papers, reports, letters, memoranda, films, electronic data, photographs, audio and video recordings of or relating to the investigation conducted by the Federal Bureau of Investigation and the U.S. Attorney's Office

3

of the Eastern District of Virginia into alleged civilian co-conspirators of the
disclosures of information by Manning."

Plaintiff acknowledged a willingness to pay for fees for more than (2) hours of search effort and

for duplication charges in excess of one hundred (100) pages, and set no monetary limits on her

willingness to pay fees associated with the processing of her request. Finally, plaintiff sought

expedited processing of her request arguing an "urgency to inform the public about an actual or

alleged government activity," and a "matter of widespread and exceptional media interest in

which there exist possible questions about the governments integrity which affect public

confidence." (*See* **Exhibit A.**)

(7)     By letter dated March 7, 2014, the FBI acknowledged receipt of plaintiff's FOIPA

request, assigning it FOIPA number 1255610-000.  The FBI advised plaintiff her FOIPA request

did not contain sufficient information to conduct an accurate search of the FBI's Central Records

System ("CRS") and enclosed a Certification of Identity form for plaintiff to fill out and sign

under perjury statement attesting to her identity.  The FBI advised plaintiff that failure to return

the completed form within thirty (30) days from the date of the letter would result in her request

being closed.  Finally, the FBI notified plaintiff that she could appeal this determination to the

Department of Justice's Office of Information Policy ("OIP") within sixty (60) days from the

date of the letter.  (*See* **Exhibit B.**)

(8)     By letter dated March 18, 2014, plaintiff perfected her FOIPA request by

returning the signed Certificate of Identity form with the requested additional personal identifiers

in order for the FBI to conduct an accurate search.  The plaintiff made a few modifications to her

February 20, 2014, FOIPA request.  Specifically, plaintiff requested:

- A. "Documents, papers, reports, letters, memoranda, films, electronic data,
  photographs, audio and video recordings of or relating to the investigation
  conducted by the Washington Field Office (WFO), the Department of Justice

Counterepionage [*sic*] Section (CES), the U.S. Attorney's Office for the Eastern District of Virginia (E.D.Va.) into the alleged disclosures of classified and sensitive by [*sic*] unclassified information by then-Private First Class (PFC) Bradley Edward Manning (a.k.a. Chelsea Elizabeth Manning)."

- B. "Any other documents, papers, reports, letters, memoranda, films, electronic data, photographs, audio and video recordings of or relating to the investigation conducted by the Federal Bureau of Investigation and other agencies into suspected or alleged civilian co-conspirators of the disclosures alleged to have been conducted by Manning."

Plaintiff specified that she was seeking any responsive records from "May 2010 to [the] present" and provided "Case No. 10-GJ-3793" as additional information she thought would assist the FBI in locating responsive records. She also renewed her request for expedited processing of her request. (*See* **Exhibit C.**)

(9)    By letter dated March 21, 2014, the FBI acknowledged receipt of plaintiff's now perfected FOIPA request. The FBI advised her that it was searching its CRS for potentially responsive records and that she could check for the future status of her request at www.fbi.gov/foia. (*See* **Exhibit D.**)

(10)    By letter dated April 3, 2014, the FBI denied plaintiff's request for expedited processing. The FBI concluded that the topic of her request was not a matter "in which there exist possible questions about the government's integrity which affect public confidence." Finally, the FBI advised plaintiff that she could appeal this determination to OIP within sixty (60) days from the date of the letter. (*See* **Exhibit E.**)

(11)    By letter dated April 8, 2014, the FBI advised plaintiff the information she requested was located in a pending investigative file exempt from disclosure pursuant to FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), which exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings... ." The FBI advised plaintiff that she could

appeal this determination to OIP within sixty (60) days from the date of the letter. (*See* **Exhibit F.**)

(12)   By letter dated April 11, 2014, plaintiff appealed the FBI's denial of her request for expedited processing to OIP. (*See* **Exhibit G.**)

(13)   By letter dated April 17, 2014, plaintiff appealed the FBI's denial of her request pursuant to FOIA Exemption 7(A) to OIP.  In her appeal, she also challenged the FBI's failure to address her request for disclosure of the requested records under the Privacy Act. (*See* **Exhibit H.**)

(14)   OIP acknowledged receipt of plaintiff's appeal concerning the FBI's denial of expedited processing by letter dated April 29, 2014, and advised plaintiff it was closing the appeal because the FBI had already responded to her FOIPA request, rendering the expedited processing request moot. (*See* **Exhibit I.**)

(15)   By letter dated May 7, 2014, OIP acknowledged receipt of plaintiff's April 17, 2014 appeal of the FBI's denial of her request pursuant to Exemption 7(A) and assigned it appeal number AP-2014-02758. OIP advised her that it received her appeal on April 30, 2014, and also that it would notify her of its decision as soon as possible. (*See* **Exhibit J.**)

(16)   By letter dated August 7, 2014, OIP affirmed the FBI's action on plaintiff's request. OIP determined the records responsive to plaintiff's request were exempt from the access provision of the Privacy Act, citing 5 U.S.C. § 552a(j)(2) and see also 28 C.F.R. § 16.96 (2013). OIP further determined that the FBI properly denied her request pursuant to Exemption 7(A). OIP advised plaintiff she could file a lawsuit in federal district court if she was dissatisfied with OIP's action. In addition, OIP informed plaintiff that as a non-exclusive alternative to litigation, she could seek the mediation services of the Office of Government Information

Services ("OGIS"), National Archives and Records Administration ("NARA"), in order to potentially resolve her dispute with the FBI.  (*See* **Exhibit K.**)

(17)    By letter dated January 5, 2015, plaintiff asked for assistance from OGIS in her FOIPA dispute with the FBI.  (*See* **Exhibit L.**)

(18)    By letter dated January 16, 2015, OGIS acknowledged receipt of plaintiff's mediation services request, assigning it Case Number 201500307.  (*See* **Exhibit M.**)

(19)    By letter dated February 24, 2015, OGIS responded to plaintiff's mediation assistance request.  OGIS provided additional explanation about the application of Exemption 7(A) generally and suggested that since Exemption 7(A) is temporal in nature, that plaintiff may wish to make a new request for her records at some point in the future to see if Exemption 7(A)'s protections have been lifted.  (*See* **Exhibit N.**)

(20)    Plaintiff filed this instant lawsuit on October 8, 2015.  *See* ECF No. 1, Complaint.

## THE FBI'S CENTRAL RECORDS SYSTEM

(21)    The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions.  The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(22)    The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories.  The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the

FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters.  For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components:  (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[3]  Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order.

## THE CRS GENERAL INDICES AND INDEXING

(23)    The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS.  The CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties.  The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval.  The entries in the general indices fall into two category types:

    a.  Main entry.  This entry pertains to records indexed to the main subject(s) of a file, known as "main file" records.  The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file.

---

[3] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case specific file number.

b. Reference entry. This entry, or a "cross-reference," pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in a "main" file record about a different subject matter.

(24)     FBI Special Agents ("SA") and/or designated support personnel may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery). Indexing information in the CRS is based on operational necessity, and the FBI only indexes that information considered relevant and necessary for future retrieval. Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

## AUTOMATED CASE SUPPORT

(25)     Automated Case Support ("ACS") is an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995. As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. ACS has an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[4]

(26)     The Universal Index ("UNI") is the automated index of the CRS and provides all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching. Individual names may be recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event. Moreover, ACS implementation built upon and

---

[4] ACS and the next generation Sentinel system are relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompasses data that was already indexed into the prior automated systems superseded by ACS. As such, a UNI index search in ACS is capable of locating FBI records created before its 1995 FBI-wide implementation to the present day in both paper and electronic format.[5] Currently, UNI consists of approximately 112.5 million searchable records and is updated daily with newly indexed material.

## ACS and SENTINEL

(27)    Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012. Sentinel provides a web-based interface to FBI users, and it includes the same automated applications that are utilized in ACS. After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel; however, Sentinel did not replace ACS and its relevance as an important FBI search mechanism. Just as pertinent information was indexed into UNI for records generated in ACS before July 1, 2012, when a record is generated in Sentinel, information is indexed for future retrieval. Moreover, there is an index data sharing nexus between the Sentinel and ACS systems whereby components of information indexed into Sentinel are also replicated or "backfilled" into ACS. In sum, the Sentinel case management system builds on ACS and shares its operational purpose; Sentinel provides another portal to locate information within the vast CRS for FBI records generated on or after July 1, 2012.

---

[5]    Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices." A search of the manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958; and for requests seeking information about organizations or events on or before January 1, 1973. In this case, plaintiff was born in 1987, so any potentially responsive records would be captured through a UNI search.

## SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S FOIPA REQUEST

(28)     Main and Cross-Reference Files.  At the time of plaintiff's perfected March 18,

2014 FOIPA request, it was RIDS policy to search for and identify only "main" files responsive

to most FOIPA requests at the administrative stage.  Therefore, during the litigation stage RIDS

conducted an additional search of the CRS to locate any potential "cross reference" material

responsive to plaintiff's request.[6]

(29)     Index Searching.  To locate CRS information, RIDS employs an index search

methodology.  Index searches of the CRS are reasonably expected to locate responsive material

within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate

retrieval based on operational necessity.  Given the broad range of indexed material in terms of

both time frame and subject matter that it can locate in FBI files, the automated UNI application

of ACS is the mechanism RIDS employs to conduct CRS index searches.  Since plaintiff's

request seeks records that may have been generated on or after July 1, 2012, an overlapping

search of ACS via the UNI application and a Sentinel index search are performed.

(30)     CRS Searches and Results.  In response to plaintiff's perfected March 18, 2014

FOIPA request, RIDS conducted a CRS index search on April 8, 2014, for responsive main files

records employing the UNI application of ACS and a Sentinel index search by utilizing a six-

way phonetic breakdown of the subject's names, including any variations of the first, or last, e.g.

"Manning, Bradley, Edward," "Manning, Bradley, E," "Manning, B, E," "Manning, Bradley,"

"Manning, B," "Manning, Edward," "Manning, E," "Manning, Chelsea, Elizabeth," "Manning,

Chelsea, E," "Manning, C, E," "Manning, Chelsea," "Manning, C," and "Manning, Elizabeth."

The FBI also used the subject's date of birth, place of birth, plaintiff's description of the relevant

---

[6]   Reference entries, or cross-references, are mere mentions of a subject, individual, or organization in files
that are indexed to other subjects, individuals, organization, events, or activities.

investigation (including dates), and case number she provided (10-GJ-3793) to facilitate the

identification of responsive records. As a result of these search efforts, potentially responsive

investigative records were located. The FBI concluded, based on review of the investigative case

file containing potentially responsive records and communications with the Special Agent

("SA") in charge of the investigation, that the records were part of and related to pending

enforcement proceedings.

(31)     The FBI subsequently conducted an additional search for any cross references

responsive to plaintiff's request. The FBI conducted (a) a search of the CRS index employing

the UNI application of ACS and (b) a Sentinel index search, both using the same search terms it

used in its original search as described in paragraph 30.[7] This additional search of the CRS

confirmed the results of the original search for main files and also identified additional

responsive cross-references. Review of these cross-references revealed that they also are part of

and related to pending enforcement proceedings.

(32)     The FBI concluded that a separate search for records responsive to the second part

of plaintiff's request (seeking records about the FBI's investigation of other individuals involved

in the unauthorized disclosure of classified materials that were published on the WikiLeaks

website) was unnecessary. The investigative files containing records responsive to the first part

of plaintiff's request (for records about herself) were the same files located and processed by the

FBI in response to the FOIA request at issue in *EPIC v. DOJ*, another lawsuit involving records

related to the FBI's investigation of the unauthorized disclosure of classified information that

was published on the WikiLeaks website. *See* 82 F. Supp. 3d 307 (D.D.C. 2015). As a result of

the *EPIC* case, the FBI was aware that the records responsive to both parts of plaintiff's request

---

[7]   The search cut-off date for the cross-reference searches was determined to be April 8, 2014, the day the
FBI conducted its original search for responsive records. *See* 28 C.F.R. § 16.4(a).

12

were maintained in the same files, which were identified during the FBI's search for records responsive to plaintiff's request about herself. This conclusion was confirmed upon the review of the files located in the FBI's search for records about plaintiff. Accordingly, the FBI concluded that a separate search for records responsive to the second part of plaintiff's request was unnecessary.

(33)     Scope of Search. RIDS conducted a search reasonably calculated to locate records responsive to plaintiff's request. First, given its comprehensive nature and scope, the CRS is the principal records system searched by RIDS to locate information responsive to most FOIPA requests, because the CRS is where the FBI indexes information about individuals, organizations, events, and other subjects of investigative interest for future retrieval. *See infra* ¶ 21. Second, given plaintiff's request seeking investigative records pertaining to herself, such information would reasonably be expected to be located in the CRS via the index search methodology. Indeed, this search methodology led to the specific investigation described by plaintiff in her request – *i.e.*, the FBI's investigation related to plaintiff's unauthorized disclosures of classified information that was published on the WikiLeaks website.[8]

(34)     The records responsive to plaintiff's request are part of the FBI's active, ongoing criminal investigation into the above-described disclosure of classified information. The FBI has determined that these records are exempt from disclosure pursuant to FOIA Exemption 7(A) because disclosure would adversely affect the FBI's pending investigation and any resulting prosecutions. Further, the FBI has determined that these records may also be exempt, in whole or in part, under one or more other FOIA exemptions. Finally, the FBI concluded, upon review,

---

[8] This is a high-profile case and has been the subject of other FOIA requests and one lawsuit (*EPIC v. DOJ*, 12-cv-0127 (D.D.C.)), so even before conducting the searches described in this declaration, RIDS was aware of the investigation about which plaintiff requested records.

that no public source material is available for release because any such disclosure at this point

would adversely affect the FBI's pending investigation.[9]

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE PRIVACY ACT

(35)    When an individual requests records about himself/herself from the FBI, RIDS

first analyzes the request under the Privacy Act, which generally provides individuals a right of

access to records about them maintained in *government* files, unless the records are part of a

system of records exempted from individual access. *See* 5 U.S.C. § 552a(d). One such

exemption is Privacy Act Exemption (j)(2), which exempts from mandatory disclosure systems

of records "maintained by an agency or component thereof which performs as its principal

function any activity pertaining to the enforcement of criminal laws, including police efforts to

prevent, control, or reduce crime or to apprehend criminals … ." 5 U.S.C. § 552a(j)(2).

(36)    Under the Privacy Act, agencies may promulgate rules to exempt systems of

records from various provisions of the Act, to include individual requests for access or

amendment. *See* 5 U.S.C. § 552a(d), (j) and (k). Pursuant to this authority, the U.S. Department

of Justice ("DOJ") promulgated regulations exempting certain systems of records from

individual access, *inter alia*. The FBI is a criminal and regulatory enforcement agency within

DOJ responsible for enforcing federal laws, and DOJ has exempted FBI law enforcement

investigative records maintained in the CRS from the Privacy Act's access provision pursuant to

(j)(2). *See* 28 C.F.R. § 16.96(a)(1).[10] Consequently, plaintiff has no individual right of access to

---

[9] While the FBI has acknowledged that it is investigating whether anyone else was involved with plaintiff in the unauthorized disclosures of classified information made to WikiLeaks, the FBI has not and is not confirming or denying whether it is investigating any particular person, pursuant to FOIA Exemptions 6, 7(A), and 7(C).

[10] Privacy Act System of Records FBI-002, 63 FR 8671 (1998) (last publication of complete notice).

investigative records about herself under the Privacy Act. Having reached this conclusion, the

FBI then considered whether she could access those records under the FOIA.

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA

(37)     As previously noted, the FBI concluded that records responsive to plaintiff's

request are part of and related to the FBI's active, ongoing investigation into the unauthorized

disclosure of classified information that subsequently was published on the WikiLeaks website.

Accordingly, it withheld these records pursuant to FOIA Exemption 7(A). The FBI's basis for

asserting Exemption 7(A) is detailed below.[11]

### EXEMPTION 7 THRESHOLD

(38)     FOIA Exemption 7 exempts from mandatory disclosure records or information

compiled for law enforcement purposes when disclosure could reasonably be expected to cause

one of the harms enumerated in the subparts of the exemption. *See* 5 U.S.C. § 552(b)(7). Here,

the FBI is relying on Exemption 7 to prevent interference with ongoing law enforcement

investigations and proceedings.

(39)     In order to rely on Exemption 7, an agency first must demonstrate that the records

or information it seeks to withhold were compiled for law enforcement purposes. Law

enforcement agencies such as the FBI must demonstrate that the records at issue are related to

the enforcement of federal laws and that the enforcement activity is within its law enforcement

duties. Here, responsive records are contained in files pertaining to the FBI's investigation of the

unauthorized disclosure of classified information that was published on the WikiLeaks website.

The FBI's Washington Field Office opened a criminal/national security investigation into these

---

[11] The same investigative records at issue here were also at issue in *EPIC v. DOJ*, 12-cv-0127 (D.D.C.).
This Court upheld the FBI's protection of the records pursuant to Exemption 7(A). *See EPIC v. DOJ*, 2015 WL
971756 (D.D.C. Mar. 4, 2015) (Memorandum Opinion granting DOJ's motion for summary judgment).

allegations in 2010 and maintains them pursuant to applicable Attorney General Guidelines. The investigations are ongoing and clearly are within the law enforcement duties of the FBI to detect and undertake investigations into possible violations of Federal criminal laws. *See* 28 U.S.C. § 533. Thus, all of the records responsive to plaintiff's FOIPA request were compiled for law enforcement purposes and readily meet the threshold for applying FOIA Exemption 7.[12]

### EXEMPTION 7(A) – PENDING ENFORCEMENT PROCEEDINGS

(40)    FOIA Exemption 7(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to interfere with enforcement proceedings.

5 U.S.C. § 552(b)(7)(A).

(41)    Application of this exemption requires:  the existence of law enforcement records; a pending or prospective law enforcement proceeding; and a determination that release of the information could reasonably be expected to interfere with the enforcement proceeding. The FBI has withheld all responsive records pursuant to Exemption 7(A). As established above, these records are law enforcement records that are part of and related to a pending FBI investigation. The FBI has determined that disclosure of any responsive records in the midst of this pending investigation, and prior to any prosecutions that may result from the investigation, is reasonably expected to interfere with the investigation as well as any resulting prosecutions. As such, the release of these records would interfere with pending and prospective enforcement proceedings.

---

[12] The FBI's files contain responsive records originating from other government agencies ("OGAs"). Because the FBI is withholding all records pursuant to Exemption 7(A), it has not referred these records to their originating OGAs for review and application of other exemptions. The FBI believes these records are also subject to one or more of the other exemptions whose applicability will be preserved for future assertion. If the FBI's Exemption 7(A) withholdings are not upheld, it will refer the records to the originating OGAs for review and a direct response to plaintiff.

## Types of Documents Protected By Exemption 7(A)

(42)     Providing a document-by-document description or listing of the records potentially responsive to plaintiff's request at this juncture would undermine the very interests that the FBI seeks to protect under Exemption 7(A). In order to protect these interests, the FBI instead has described the types of potentially responsive records that are being withheld in full pursuant to Exemption 7(A).[13] The FBI then grouped the document types into functional categories and described the potential harm associated with disclosing each category of information.

(43)     The pending investigative files contain the following types of documents:

(a)     Electronic Communication ("EC"):  The purpose of an EC is to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network.

(b)     FBI Letter:  This is a letter or formal correspondence in a format used by the FBI to communicate with the Department of Justice ("DOJ"), U.S. Attorneys' Offices, other government agencies ("OGAs"), other law enforcement agencies (including federal, state, local, and tribal), commercial businesses, and private citizens. Its format is identical to the business letters utilized by commercial agencies except that it contains the FBI Seal at the top of the first page, as well as specific identifying information regarding the originating office within the FBI that sent the letter (*e.g.,* Omaha Division or FBIHQ).

---

[13] Similarly, disclosing the total volume of responsive information protected by Exemption 7(A) and/or another exemption would reveal information about the nature, scope, focus, and conduct of active, on-going investigations, and thus cannot be publicly disclosed without undermining the law enforcement interests the FBI is seeking to protect by application of Exemption 7(A) in this case.

17

(c)     FD-302 (Interview Form):[14] This is an internal FBI form on which the results of FBI interviews of persons are recorded.  Such interview information may later be used as evidence at criminal trials.  These interview forms are often incorporated into FBI Investigative Reports.  The contents of these forms may also be incorporated into ECs for purposes of setting/covering leads.

(d)     FD-542 (Investigative Accomplishment Form):  This is an internal FBI form on which employees claim accomplishments and investigative methods used in investigations.

(e)     FD-794 (Payment Request):  This is an internal FBI form used by employees to request payment for reimbursement of expenses incurred during an investigation.

(f)     Memorandum:  This is ordinarily a communication from the FBI to the Attorney General and/or other DOJ component officials; from one employee/official to another at FBIHQ; or from one employee/official to another within an FBI field division.  It serves to assist in the overall supervision of a case by summarizing pertinent details of an investigation.

(g)     E-mails:  These are electronic messages exchanged between and among FBI Special Agents, other FBI employees, and personnel from OGAs, concerning these investigations.

(h)     Letterhead Memorandum ("LHM"):  This memorandum is an interim summary that reports information, usually derived from FD-302s, concerning the subject of an investigation.  It is designed to alert other field offices and/or FBIHQ about pertinent developments in an investigation.  Usually, an LHM is attached to a cover sheet, which is typically an FBI letter.  The LHM can also be detached from the cover sheet and disseminated to other Government agencies as a "Law Enforcement Sensitive/For Official Use Only" document.

---

[14] All forms with the designation "FD-" are forms created and utilized internally by the FBI.

(i)     FBI Records Checks:  These are computerized print-outs of the results of checks of databases concerning FBI records, local law enforcement records, and/or business records.  The information from these records checks is often incorporated into Investigative Reports and ECs for lead purposes.

(j)     FBI Investigative Reports:  These are summaries of investigations as of the date of the report.  The purpose of these documents is to advise FBIHQ and FBI field offices of the investigative information that has been obtained concerning a particular investigation.

(k)     FBI Computer Printouts:  These are printouts from internal FBI computer systems that describe information concerning FBI investigations.  The information included on the documents may include file numbers, names, and addresses of subjects and suspects, key dates and places of crimes, names of Special Agents ("SAs") assigned to investigations, and other similar information.

(l)     FBI Investigative Inserts:  Internal FBI forms used to record investigative actions such as an FBI records check of a database of law enforcement records.  These inserts are often incorporated into FBI Investigative Reports.

(m)    Other Investigative Documents:  This category consists of various types of documents reflecting information and evidence gathered during an FBI investigation, the sources from/by which such information and evidence was gathered, methods used to obtain the information and evidence, and methods used to analyze the information and evidence.  To describe the documents in this category any more specifically would reveal the scope of the FBI's investigations, as well as the sources and methods being utilized by the FBI.

(n)     Miscellaneous Administrative Documents:  The FBI uses various types of forms throughout a criminal investigation, including storage envelopes, bulky exhibit cover

sheets, transmittal forms (*i.e.*, facsimile cover sheets), letters, and routing slips.  Also included are forms that are placed in a file to document when a serial has been removed and placed elsewhere.  For example, an FD-5A (Automated Serial Permanent Charge-Out) is placed in a file to show that a serial was transferred to a sub-file.  Other documents in this category include notes, memoranda, letters, telegrams, and other attachments of an administrative nature which do not fall into an official government format.

## Reasonable Expectation of Interference

(44)    In processing requests under the FOIA, the FBI has established procedures to implement the FOIA as efficiently as possible.  When the FBI receives a request for records about a pending investigation, it commonly asserts FOIA Exemption 7(A) to protect the pending investigation and/or any related prospective investigations and prosecutions.  Nonetheless, the FBI reviews the records to identify and release any reasonably segregable information contained in the responsive file(s) that would not jeopardize ongoing or future enforcement proceedings.  As discussed below, the FBI's review of the responsive records in the pending cases reveals no materials that can be released without jeopardizing current or prospective investigative and/or prosecutive efforts.  In addition, a review of the responsive records determined there is no public source material available for release that would not adversely affect pending or prospective enforcement proceedings if disclosed.

(45)    Here, RIDS has reviewed and categorized the types of documents described above into two categories:  Evidentiary/Investigative Materials and Administrative Materials.  Each

responsive record, and the information contained in each record, falls into one or both of these categories.[15]

(46)   *Evidentiary/Investigative Materials*.  This category includes copies of records or evidence, analyses of evidence, and derivative communications discussing or incorporating evidence.  A derivative communication describes, verbatim or in summary, the contents of the original record, how it was obtained, and how it relates to the investigation.  Other derivative communications report this information to other FBI field offices, law enforcement agencies, or Federal agencies, either to advise them about the progress of the investigation, or to elicit their assistance in handling investigative leads.  The following subparagraphs describe the types of evidentiary materials in the responsive records and the anticipated harm that could reasonably result from the release of the materials.

(a)   Confidential Source Statements:  Statements made to the FBI by sources based on express or implied assurances of confidentiality are one of the principal tools used in proving facts that form the basis for a prosecution.  These statements contain information obtained from individuals or organizations with knowledge of potential criminal activities related to the unauthorized disclosure of classified information being investigated by the FBI.  If the FBI were to release this information, the sources that have chosen to cooperate with law enforcement could be subjected to retaliation, intimidation, or physical or mental harm.  This would have a chilling effect on the FBI's investigative efforts here and any resulting prosecutions, inasmuch as potential witnesses and/or sources might fear exposure and reprisals from the subjects of these investigations and/or from other individuals.  Implicit in conducting interviews in investigations of this nature is the notion that a source's identity and the information he/she/it provided will be

---

[15]   A single record – *e.g.*, an FBI Investigative Report – may serve several purposes and may contain multiple categories of information, such as witness statements, administrative directions, and/or evidentiary materials; such a report could be included in both categories, as could the information contained in the report.

afforded confidentiality. The FBI goes to great lengths to protect and maintain sources'

confidentiality because it is an integral part of successful investigations and prosecutions. The

release of source statements in the responsive records at issue here would disrupt and harm

ongoing investigative actions and any resulting prosecutions.

(b)     Exchange of Information Between FBI and Other Law Enforcement

Agencies:  Release of information exchanged between the FBI and its law enforcement partners

would disclose evidence, investigative information, and criminal intelligence developed by

agencies that have cooperated with and provided information to the FBI, and that are still doing

so, in the pending investigation.  Inherent in this cooperative effort is the mutual understanding

that information provided to the FBI by these agencies will not be prematurely released.  This

information was gathered, and is continuing to be gathered, to help identify subjects, suspects,

and/or other individuals of potential investigative interest; to identify and assist in locating

witnesses and/or confidential sources; and to further the progress of the investigation.  Release of

this information at this point in the investigative process would reveal the scope and focus of the

investigation; identify and tip off individuals of interest to law enforcement; and provide

suspects or targets the opportunity to destroy evidence and alter their behavior to avoid detection.

All of this clearly would negatively impact the pending investigation.

(c)     Documentary Evidence/Information Concerning Documentary Evidence:

Disclosure of documentary evidence being gathered in the ongoing investigation, or information

discussing, describing, or analyzing the documentary evidence, would undermine the

investigation and any resulting prosecutions by prematurely revealing the scope and focus of the

investigation, and also the subjects of, and persons of investigative interest in, the investigation.

Once subjects and persons of interest become aware of the FBI's attention, they are able to take

defensive actions to conceal their activities, elude detection, mislead the investigation, and/or suppress or fabricate evidence. Additionally, disclosure of documentary evidence and/or information concerning documentary evidence also could reasonably lead to the identification of the sources of the evidence. This too would adversely impact the ongoing investigation and any resulting prosecutions because it could result in possible intimidation of or harm to those witnesses and sources. This evidence, and information about this evidence in other documents, is pertinent and integral to the FBI's ongoing investigation and future prosecutions, and thus its disclosure while the investigation is pending would adverse affect this and any resulting prosecutions.

(47)   *Administrative Materials*.  Materials that fall within this category include items such as case captions, serial numbers, identities of FBI field offices, dates of investigations, and detailed instructions designed to ensure that investigative procedures are conducted within the appropriate FBI and DOJ guidelines. The following subparagraphs describe the types of administrative materials contained in the responsive records and the anticipated harms that could reasonably result from the disclosure of such materials in the midst of the FBI's ongoing investigation and in any resulting prosecutions. In many instances, administrative information is contained at the beginning or end of correspondence or documents that fall within the Investigative/Evidentiary Material category, such that release of the administrative information would also reveal the investigative interests of the FBI and could enable suspects, targets, and individuals of interest to the FBI to discern a "road map" of the investigations.

(a)   <u>Reporting Communications</u>: These communications permit an agency to monitor the progress of the investigation and facilitate its conduct. They can reveal or confirm the cooperation of other Government agencies in the investigation; are replete with detailed

23

information about the FBI's investigative activities and about potential witnesses/sources to be

interviewed; and contain background information about third party individuals, the origins of

information connecting them to the investigations, and their connections to subjects and

individuals of investigative interest to the FBI. The release of this information would

prematurely reveal the nature and scope of this active and ongoing investigation by revealing:

the investigative steps taken to obtain witness and source interviews; techniques and

investigative methods used to compile and/or solicit information from various sources; and any

potential or perceived challenges in the investigation.

      (b)    <u>Miscellaneous Administrative Documents</u>: These materials include items

such as storage envelopes, transmittal forms, and standardized forms used for a variety of

particular purposes. These types of materials have been used throughout the investigation for

many routine purposes; however, the manner in which they have been used and organized in the

files in and of itself reveals information of investigative value, the premature disclosure of which

could undermine the pending investigation and any resulting prosecutions. An example is the

evidentiary envelope used to store records obtained from a source under an express or implied

assurance of confidentiality. While the envelope is not specific to these investigations,

handwritten notations on the envelope identify dates, places, and the identities of the sources

providing the information. In addition, the mere fact that an FBI Special Agent used an envelope

for the storage of records he/she has obtained from a source is revealing on its own. The

disclosure of these materials could harm the investigation by providing details that, when viewed

in conjunction with knowledge possessed by subjects or others knowledgeable about the

unauthorized disclosure of classified information being investigated, would provide information

useful in identifying witnesses and sources, ascertaining investigative strategies, and determining what evidence the FBI has collected.

(48)   Administrative Instructions:  This type of information, whether it originates in communications from the FBI or other government or law enforcement agencies, would disclose specific investigative procedures employed in the investigation.  Release of this information would thus permit subjects or individuals of investigative interest to the FBI to anticipate law enforcement actions and to alter, destroy, or fabricate evidence to their benefit, or to mislead the investigation.  Specific examples of these instructions include the setting out of investigative guidelines and requests for specific investigative inquiries and affirmative tasking to various FBI field offices or to other government or law enforcement agencies.  These are commonly referred to as "investigative leads" and are set forth in documents throughout the course of the investigation.

## CONCLUSION

(49)   The FBI has performed a reasonable search for records responsive to plaintiff's request, identified the specific investigation about which plaintiff requested records, and located the records that plaintiff requested.  The FBI first analyzed the request under the Privacy Act and concluded that plaintiff's access to the records is exempted under Privacy Act Exemption (j)(2) and DOJ's regulation exempting the CRS from the Privacy Act's access provisions.  The FBI then considered the request under the FOIA.  The FBI carefully reviewed the responsive records; determined that they are part of and related to a pending investigation and that disclosure at this time could reasonably be expected to adversely affect the investigation and any resulting prosecutions; and denied plaintiff's request for them pursuant to FOIA Exemption 7(A).[16]  The

---

[16] Pursuant to the parties' proposal to bifurcated summary judgment proceedings, which the Court granted, the FBI initially is defending only the applicability of Exemption 7(A), but preserves the right to defend any

FBI's segregability review determined there is no reasonably segregable information, including public source material, which can be released at this time without adversely affecting the investigation and any resulting prosecutions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through N attached hereto are true and correct copies.

Executed this ___10ᵗʰ___ day of March, 2016.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

additional underlying exemptions that may apply. *See* Minute Order (Dec. 15, 2015); *see also* ECF No. 11, Joint Status Report and Proposed Schedule.

26